UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| SUSAN SANDERS, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. 4:12-CV-2913 |
| | § | |
| MICHAEL J. ASTRUE, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM AND RECOMMENDATION

Plaintiff, Susan Ann Sanders ("Sanders"), seeks review of the final determination

by Defendant Carolyn W. Colvin, Acting Commissioner of the Social Security

Administration ("Commissioner"),[1] that she is not entitled to receive Title II social

security disability insurance benefits. The case has been referred to this Court pursuant

to 28 U.S.C. § 636(b)(1). Dkt. 3. Now pending are Sanders' Motion for Summary

Judgment and the Commissioner's Cross Motion for Summary Judgment. Dkts. 12–14.

Having considered the parties' briefing, the applicable legal authorities, and all matters of

record, the Court **recommends** Sanders' motion be **DENIED** and summary judgment be

**GRANTED** for the Commissioner.

---

[1]      Michael Astrue was the Commissioner of the Social Security Administration at the time
that Plaintiff filed this case, but he no longer holds that position. Carolyn W. Colvin is Acting
Commissioner of the Social Security Administration and, as such, is automatically substituted as
Defendant. *See* FED. R. CIV. P. 25(d).

## Background

Sanders is a 63-year-old woman who suffers from diabetes mellitus, hypertension, obesity, and osteoarthritis. Tr. 41. She completed one year of college and worked as a secretary and an airline reservation agent. Tr. 46, 145, 147.

## I.    Medical Record

On June 3, 2008, Sanders began treatment at Scott and White Clinic with Dr. James A. Sterling, a family medicine doctor. Tr. 194. Sanders provided her medical and family history, including that her father died from complications of diabetes at age 51 and her brother had been diagnosed with diabetes and morbid obesity. Sanders herself denied any recent weight changes, exertion intolerance, or limb pain. However, she complained of intermittent numbness and decreased sensation in her lower extremities. Tr. 194–96. Dr. Sterling assessed Sanders as morbidly obese and noted that she had been diagnosed with diabetes at age 40. Dr. Sterling also noted Sanders had a long history of poor control of her blood sugar and poor compliance with dietary recommendations. His physical examination of Sanders' feet revealed a "left diabetic foot ulcer" that Sanders stated had "been present for a month or so." Tr. 195–96. Dr. Sterling counseled Sanders on making an "aggressive lifestyle change" and advised her of "the long-term consequences of poorly controlled diabetes." His treatment included specific dietary recommendations, a referral to podiatry, and a request for a follow-up exam. Tr. 196.

Dr. Sterling referred Sanders to Dr. Joe Martin, a podiatrist at Scott and White. Dr. Martin examined the ulcer on her left foot and it was debrided, cleaned, and dressed. Sanders was given a brace to take weight off of her foot and ordered to clean and dress

the area daily, then return for a follow up in one to two weeks. Tr. 219–20. In July 2008, Sanders returned to Dr. Martin for a follow-up appointment. The ulcer had improved in size and was "fairly superficial." Dr. Martin debrided, cleaned, and dressed the ulcer again, and Sanders was ordered to follow up in three to four weeks. Tr. 221.

On August 5, 2008, Sanders returned to Scott and White. She reported having been in car accident two weeks prior, but she stated all of her symptoms from that incident were improving. Dr. Steven Higginbotham treated Sanders for her diabetes. Sanders complained to Dr. Higginbotham that, despite compliance with her medication, her blood sugar was not well-controlled. In fact, she reported that her blood sugar levels were always over 200, even when she fasted in the mornings. Dr. Higginbotham found multiple ecchymoses (pooled blood under the skin) over Sanders' left chest, lower abdomen, and lower extremities. Her left abdomen also showed an "approximately 3-cm ulceration without surrounding erythema, drainage, discharge, or fluctuance." Tr. 198. Dr. Higginbotham noted that Sanders' diabetes was "poorly controlled" and recommended that she increase her dose of Lantus to lower her blood sugar level. Sanders was ordered to follow up in one month. Tr. 197–98. On the same day, Sanders also saw Dr. Martin, her podiatrist. Despite Dr. Martin's previous instructions that she wear a foot brace to take the weight off the ulcer on her left foot, Sanders had not been wearing the brace. Accordingly, Dr. Martin repeated his order that Sanders wear the brace continuously. Tr. 222.

A week later, on August 12, 2008, Sanders visited the urgent care physician at Scott and White, complaining of a fever and redness and swelling in her left leg. Dr.

Thomas Welch examined Sanders and assessed her condition as a "probable early abscess in the left leg." Tr. 199–200. She was prescribed Rifampin and Bactrim and ordered to report to an emergency room if her symptoms significantly worsened. Tr. 200.

The next day, August 13, 2008, Sanders saw Dr. Sterling, her family doctor. After Dr. Sterling's examination, Sanders leg was injected with local anesthesia, and the abscess was cut open, irrigated, packed and bandaged. Sanders was given antibiotics and told to follow up the next day. Tr. 201. On August 14th, there was a significant improvement in Sanders' leg. Tr. 203–205. By August 21st, the wound was "generally healed over." Tr. 206.

In September 2008, Sanders returned to Dr. Martin for a podiatry examination of her foot ulcer, which had increased in size. Dr. Martin noted that Sanders needed additional surgery on her foot, and Sanders accordingly underwent a partial amputation of a metatarsal bone in her foot. Notes from several of her follow-up appointments that month indicated that she was healing well, with no signs of infection. Tr. 218, 223–25.

In October 2008, after her foot surgery, Sanders returned to her family doctor, Dr. Sterling. Sanders' hemoglobin A1C levels were extremely high—15%. Accordingly, Dr. Sterling and Sanders "had a very frank, open discussion about the long-term end-organ consequences of uncontrolled hyperglycemia/diabetes." Tr. 208. Dr. Sterling recorded that Sanders has "apparently never had great compliance nor good control." Dr. Sterling again recommended a strict diet and exercise. Despite her test results, Sanders did not report any numbness or tingling in her extremities, and her foot was healing well.

4

Tr. 209–10. Dr. Martin, her podiatrist, recommended specific postoperative shoes and orthotics. Tr. 226-27.

In February 2009, Sanders developed a new ulcer on the third toe on her right foot. Sanders denied any limb pain, but Dr. Sterling's physical exam noted "deconditioning changes . . . in the proximal upper and lower extremities" and that "sensation with 10g monofilament testing [was] essentially absent." Tr. 212. Dr. Sterling again counseled Sanders about aggressive lifestyle changes to control her weight, glucose levels, and lipids. Tr. 211–12.

In April 2009, Sanders began treatment for her diabetes and blood pressure problems with Dr. Mark Le. Tr. 233. Sanders' blood sugar was reported to range from 200-350, and her hemoglobin A1C was at 13%. Sanders again denied experiencing joint pain, stiffness, swelling, or muscle cramps. Dr. Le's treatment plan from this appointment reads simply, "emphasize diet modification." He also increased her Lentus dosage to 100 units. Tr. 234.

In June 2009, Sanders returned to Dr. Martin for a follow-up on her ulcer on right foot. Dr. Martin assessed the ulcer as "fairly superficial," and debrided, cleaned, and dressed the ulcer. He prescribed Augmentin, and recommended a different postoperative shoe. Tr. 228.

On June 4, 2009, Sanders applied for social security disability insurance benefits, alleging that she had been disabled since October 4, 2008. Tr. 136.

When she saw Dr. Le again in July 2009, her home blood sugar level tests now averaged 200, and her most recent hemoglobin A1C level was 10%. Sanders reported

that she had been following a diabetic diet, but that she had begun experiencing tingling numbness in her hands and feet. Dr. Le recorded that Sanders had a "long hx of OA," causing pain in her ankles and toes. Sanders reported that her pain increased with activity, but medicine was helping. Tr. 232.

In August 2009, Sanders reported blood sugar levels had been approximately 160 or less. She was, however, still experiencing tingling numbness in her hands and feet, in addition to edema in her extremities. Tr. 283–84.

On September 10, 2009, the tingling numbness and edema in her legs persisted. Sanders had developed a callous formation under her left foot third toe. Tr. 280. At that appointment, Sanders also reported injuries from a fall in her home five days prior to her appointment, including pain in her nose and chest, dizziness, palpitations, and headaches.

Sanders returned to Dr. Le later in September 2009, reporting diarrhea several times a day for the previous thirty days. Sanders reported that she was losing weight and following her prescribed diet. Tr. 277.

In January 2010, Sanders complained to Dr. Le about increasing pain in her lower back. She described the pain as "shooting" and "8/10 in intensity," but also intermittent and lasting only a few minutes at a time. Sanders stated that the pain increased with bending, lifting, and walking and that it was not alleviated with rest. Sanders also reported having problems eating, because she felt like she had a "knot in [her] throat" and "food was stuck" when she tried to swallow. She stated that she was taking her insulin, but that she was not always compliant with her other medications. Tr. 271.

On January 21, 2010, Sanders sought treatment with Dr. Robert Leisten, a podiatrist at Diagnostic Foot Specialists. Sanders reported pain when she walked with her shoe gear and that she had been unable to provide nail care for herself. Dr. Leisten treated Sanders' painful nail deformities and counseled her on proper foot care and nail hygiene. She was able to walk without pain after the treatment. Tr. 262–63.

In April 2010, Sanders again saw Dr. Le and complained of pain radiating from her wrists to her fingers on both hands. She reported weakness in her hands and pain that radiated to her elbow, and stated that the pain had persisted for months. In assessing her hands and wrists, Dr. Le wrote in his treatment notes that Sanders performed daily repetitive work. He then referred her to a neurologist for further evaluation. Tr. 266–67.

## II.    Consultative Examination with Dr. Selvakumarraj

On March 22, 2010, Dr. Pollachi P. Selvakumarraj at the Navasota Medical Center examined Sanders. Tr. 244. Sanders relayed her medical history to him, and he noted that her primary complaints were "arthritis hand, diabetes with neuropathy feet, HTN." Sanders stated had been diagnosed with arthritis ten years prior, and that the arthritis started in her big toe but moved to her hands, knees and elbows. She stated that she had morning stiffness and constant pain in her hands and feet, and intermittent pain in her knee and elbow. However, Sanders admitted that Alleve, her over-the-counter medication, "helps most of the time." Tr. 244. She also stated that she had occasional sharp pain in her feet that "resolves spontaneously" and that walking helped relieve the pain. Sanders stated that her high blood pressure was "well-controlled."

7

Sanders told Dr. Selvakumarraj that she was not exercising but that her dietary compliance was good. She also stated that she had difficulty with typing, opening cans, eating, and fine motor skills, but that she was able to cook, shop for her household, and drive herself to the store. Sanders' physical exam was mostly normal, however, Dr. Selvakumarraj noted that Sanders had a "swollen [first] MCP in her hands," "pain with extreme extension" in her right knee, and a "right foot with 2/3 hammer toes and swelling in the [first] toe." He also noted peripheral neuropathy and that her grip strength was 3-5/5, despite her inability to make a fist. Even though he noted that "she has difficulty with heel, toe, and tandem walking," Dr. Selvakumarraj stated Sanders was "able to ambulate effectively without any assistive devices." Tr. 244–47.

An x-ray of Sanders' right hand found "joint space narrowing of the index finger PIP joint," and "soft tissue swelling of the index finger." However the report stated that "no other degenerative change or osseous abnormality [was] present." Tr. 249. A metabolic panel of tests was also run on her blood. Tr. 250.

After examining Sanders and evaluating the medical test results, Dr. Selvakumarraj completed a "Medical Source Statement" form. Dr. Selvakumarraj opined that Sanders could lift and carry up to 10 pounds frequently, and lift up to 20 pounds occasionally. Next to these selections he wrote, "osteoarthritis hands, R knee pain, neuropathy." He indicated she could sit uninterrupted for eight hours, and stand for 10 minutes, and walk for 15 minutes at a time. He also stated she could sit for eight hours in an eight-hour work day, stand for a total of two hours in an eight-hour workday, and walk for one hour in an eight-hour workday. He indicated she could reach with both her left

and right hand frequently, and that her handling, fingering, feeling, and push/pull abilities were limited to "occasionally." Next to this selection, he wrote the word "osteoarthritis." He also that she could operate foot controls, with both feet, "frequently." He limited Sanders' climbing stairs and ramps and stooping to "occasionally" and stated that she could never climb ladders or scaffolds, balance, kneel, crouch or crawl. As the medical findings supporting this opinion, he listed "R knee pain, osteoarthritis feet." He stated that she could never work around unprotected heights, that she could occasionally work around moving mechanical parts, extreme cold extreme heat, vibrations. He also stated that she could shop, travel without assistance, simulate without assistance, use public transportation, climb a few steps at a reasonable pace with the use of the single handrail, prepare simple meals, prepare for personal hygiene, and sorts handle or use paper. However, he found that she was not able to "walk a block at a reasonable pace on rough or uneven surfaces", writing "osteoarthritis" next to this selection.

### III.   Application for Benefits and ALJ Hearing

Sanders filed her application for SSDI on June 4, 2009. Her claim was denied initially on August 26, 2009 and again upon reconsideration on December 1, 2009. Tr. 82–85, 86–88. An ALJ hearing was held on October 29, 2010. Sanders appeared, represented by a non-attorney advocate, and testified before ALJ Thomas G. Norman. Also present and testifying was Karen Nielson, an impartial vocational expert ("VE"). Tr. 54.

At the hearing, Sanders testified that her diabetic neuropathy caused her pain in her dominant right hand, toes, feet, and knees. Tr. 58. She stated that the neuropathy

pain, in addition to stress, was the reason she stopped working on October 4, 2008. It was likewise the reason she remained unable to work. Tr. 56–58. She stated that she experienced numbness and tingling in her feet and hands every day and that "just about anything really" exacerbated the pain. Tr. 58–59. But, Sanders also admitted that her twice-daily pain medication alleviated her pain. Tr. 59.

Sanders stated her husband cleaned and did laundry, but that she was able to prepare simple meals and shop for groceries with the aid of the motorized shopping carts. Tr. 61. Sanders also stated that she drove a car once a week, but that her pain in her hands, feet, and knees limited the amount of time she could drive to thirty minutes at a time. Tr. 62.

Sanders testified that she could sit for thirty minutes at a time and stand and walk for five minutes at a time, with the assistance of a cane. She stated that she been using the cane for several months prior to the hearing, and that it helped her maintain balance and relieve pressure from her knee. She admitted that it was not, however, prescribed by any doctor. Tr. 63. Without its assistance, she stated she could only stand and walk for "maybe two minutes." Tr. 64.

Next, the ALJ questioned the VE, who affirmed that she was familiar with the definitions, rules, and regulations governing disability. Tr. 64. She then testified that Sanders' previous work as a secretary and as a reservation agent was sedentary and skilled under the Dictionary of Occupational Titles ("DOT"). Tr. 64–65. The ALJ asked the VE a hypothetical question about Sanders' past work, which resulted in the following exchange:

10

> **ALJ**: So based on [Sanders'] age, education, and past work experience, assume I find that she can sit up to, say, three hours at a time, stand and walk for no more than two hours out of the day, and lift up to 10 pounds—sedentary level. Could she do her past relevant work?
>
> [ ... ]
>
> **Ms. Nielson**: . . . Yes, she could. Yes, sir.
>
> **ALJ**: Now, would the use of a cane interfere with anything, the two jobs, would you think?
>
> **Ms. Nielson**: They wouldn't interfere with a secretary job— no, I don't think it would.

Tr. 65.

Sanders' representative, Teri Goodwin, then questioned the VE. Upon cross-examination, the VE testified that Sanders' past work required "frequent" manual dexterity. Tr. 68. And when further questioned, the VE responded that being limited to less than frequent use of manual dexterity "would probably eliminate [someone's ability to perform either job] because both jobs are listed in the DOT . . . as frequent." Tr. 68. After this statement, Ms. Goodwin referred the ALJ to Sanders' consultative exam and x-ray results that indicated osteoarthritis in Sanders' right hand. Ms. Goodwin then asked the VE to add Sanders' limited manual dexterity to the ALJ's hypothetical. Tr. 68. The following exchange ensued:

> **Ms. Goodwin:** So [osteoarthritis in the dominant hand] would eliminate the past work and, I'm assuming, other work?
>
> **VE:** Well, if she had--if she had the-- . . . only the ability to do, let's say occasional--are you saying occasional? Then we would have to find other work at the sedentary level. She

would have skills that would transfer, like an information clerk, to a job that would be occasional use [of her right hand].

**ALJ:** I'm sorry, could you give three examples of those that would--

**VE:** Yeah, just give me a minute.

**Ms. Goodwin:** I'm sorry--what were the skills again? Skills like what?

**VE:** Well, if she's going to--if we're only going to do at occasional-- [inaudible] frequent--then I'll have to pull up three other jobs.

**Ms. Goodwin:** Okay.

**ALJ:** And then these are the secretarial-type--

**VE:** Yes.

**ALJ:** --Clerical skills that are transferring to these?

**VE:** Yes.

**ALJ:** So these are semi-skilled jobs that you're going to be giving?

**VE:** Yes. Information clerk--237.367-022, information clerk --sedentary, semi-skilled, 4,500 in the state, 200,000 nationwide.

**Ms. Goodwin:** What's the SVP?

**VE:** 4. [. . . ] ... a referral clerk--205.367-062, sedentary, 4,900--or wait--yeah--and 4,500 in the state, 205,000 nationwide; the other one that just came up was 237.367-042, and this one is a referral and information aide--sedentary, 3 semi-skilled, 5,000, 210,000 nationwide. And that's taken from the Dictionary of Occupational Titles, U.S. Department of Labor Bureau of Statistics.

**ALJ:** All right. Counsel?

**Ms. Goodwin:** I'm done.

**ALJ:** All right. Anything else, counsel?

**Ms. Goodwin:** No, sir.

Tr. 69–71.

### IV.    ALJ Decision

On February 1, 2011, the ALJ ruled that Sanders was not disabled. Tr. 36–48. The ALJ found that Sanders met the insured status requirements of the Social Security Act through December 31, 2013, and had not engaged in substantial gainful activity since her alleged disability onset date of October 4, 2008. He also found that Sanders suffered from the severe impairments of "diabetes, hypertension, obesity, and osteoarthritis of the right hand." Tr. 41. However, the ALJ found that Sanders' impairments did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. Tr. 43.

Next, the ALJ found that Sanders had the residual functional capacity ("RFC") to perform sedentary work, with the additional limitations of being able to sit for only three hours at a time, stand/walk two hours at a time, and "no more than occasional use" of her right hand. Tr. 43. In making this finding, the ALJ found that Sanders' impairments "could reasonably be expected to cause the alleged symptoms," however he also found that "[Sanders'] statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the [RFC] assessment." The ALJ summarized the submitted medical records, particularly noting

13

that Sanders failed to follow her doctors' orders for "aggressive lifestyle changes" such as diet and exercise, continuing to gain weight from October 2008 through March 2010. He also noted that Sanders' conditions improved when she followed her doctors' orders for diet and exercise and when she was compliant with her medications. Finally, he also noted that her arthritis pain was controlled by medication, that she was never referred for surgery or physical therapy, and that her treating physicians indicated that "part of her problems were related to her weight and deconditioned habitus." Tr. 46.

Based on the assessed RFC and the testimony of the VE, the ALJ found that Sanders was unable to perform her past relevant work but that she had acquired clerical skills that were transferable. Tr. 47. Accordingly, the ALJ found that Sanders would need to make "very little, if any, vocational adjustments in terms of tools, work processes, work settings, or the industry" to transition into the representative occupations listed by Ms. Nielson. Tr. 47. Accordingly, in light of her RFC, age, education, and work experience, the ALJ determined that Sanders was not disabled under the Medical-Vocational Guidelines and 20 C.F.R. 404.1568(d). Tr. 47–48.

Sanders requested administrative review of the ALJ's decision, which was denied on September 19, 2011. Tr. 1–3, 33–35. The ALJ's decision thus became the final decision of the Commissioner.

## SUMMARY JUDGMENT STANDARD

Rule 56 of the Federal Rules of Civil Procedure mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a sufficient showing of the existence of an element essential to the party's case, and

on which that party will bear the burden at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L. Ed. 2d 265 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to an material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *Celotex Corp.*, 477 U.S. at 322-23; *Weaver v. CCA Indus., Inc.*, 529 F.3d 335, 339 (5th Cir. 2008). "An issue is material if its resolution could affect the outcome of the action. A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *DIRECTV Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2006) (internal citations and quotation marks omitted).

**STANDARD OF REVIEW**

When judicially reviewing a determination that an applicant is not entitled to benefits, we determine "(1) whether the Commissioner applied the proper legal standard; and (2) whether the Commissioner's decision is supported by substantial evidence." *Waters v. Barnhart,* 276 F.3d 716, 718 (5th Cir. 2002); *see also* 42 U.S.C. § 405(g). "Substantial evidence is more than a scintilla, less than a preponderance, and is such that relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Villa v. Sullivan,* 895 F.2d 1019, 1021–22 (5th Cir. 1990). A finding of no substantial evidence is warranted only "where there is a conspicuous absence of credible choices or no contrary medical evidence." *Johnson v. Bowen,* 864 F.2d 340, 343–44 (5th Cir. 1988) (internal quotation marks and citation omitted). The court may not re-weigh

15

the evidence in the record, nor try the issues de novo, nor substitute the court's judgment for the Commissioner's, even if the evidence preponderates against the Commissioner's decision. *Harrell v. Bowen,* 862 F.2d 471, 475 (5th Cir. 1988).

## ANALYSIS

### A.    Statutory Basis for Benefits

Sanders applied for Social Security disability insurance benefits (SSDI). Social Security disability insurance benefits are authorized by Title II of the Social Security Act. The disability insurance program provides insurance to individuals who are forced into involuntary, premature retirement, provided they are both insured *and* disabled, regardless of indigence. *See* 42 U.S.C. § 423(c) (definition of insured status); 42 U.S.C. § 423(d) (definition of disability).   Applicants to SSDI must prove "disability" under the Act. *See* 42 U.S.C. § 423(d)(1)(A) (disability insurance); 42 U.S.C. § 1382c(3)(A) (SSI).

### B.    Determination of Disability

Under the Social Security Act, a "disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period not less than 12 months." 42 U.S.C. § 423(d)(1)(A).   A claimant is disabled "only if his physical or mental impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 423(d)(2)(A).   A "physical or mental impairment" is an anatomical physiological or

16

psychological abnormality demonstrable by acceptable clinical and laboratory diagnostic techniques.  42 U.S.C. § 423(d)(3); 42 U.S.C. § 1382c(a)(3)(D).

A disability claim is examined in a five-step sequential analysis to determine whether "(1) the claimant is presently working; (2) the claimant has a severe impairment; (3) the impairment meets or equals an impairment listed in Appendix 1 of the Social Security Regulations; (4) the impairment prevents the claimant from doing past relevant work; and (5) the impairment prevents the claimant from doing any other substantial gainful activity." *Audler v. Astrue,* 501 F.3d 446, 447–48 (5th Cir. 2007).  If, at any step, the claimant is determined to be not disabled, the determination is conclusive and the inquiry ends.  *Id.*

The burden of establishing disability rests with the claimant for the first four steps, and then shifts to the Commissioner to show that there is other substantial work in the national economy that the claimant is able to perform.  *Id.*  The Commissioner's analysis at steps four and five is based on the assessment of the claimant's residual functional capacity, or the work a claimant can still do despite his or her physical and mental limitations.  *Perez v. Barnhart,* 415 F.3d 457, 461–62 (5th Cir. 2005); 20 C.F.R. §§ 404.1545, 416.945.  The Commissioner assesses the RFC before proceeding from step three to four.  *Id.*  Once the Commissioner shows that a claimant is able to perform a significant number of jobs in the national economy, the burden shifts back to the plaintiff to rebut this finding.  *Id.*

## C.     Did the ALJ err at Step 5?

Sanders argues that the ALJ based his ruling that Sanders was not disabled upon his finding that she had acquired work skills from past relevant employment that were transferable to other occupations.     Sanders contends there is no evidence that she had acquired such transferable skills and, because she was 55 years old or older at the time of the decision, the ALJ should have therefore ruled that she was disabled.

### 1.     Did the ALJ err by finding that Sanders' work as a secretary was "past relevant work"?

Sanders contends that the ALJ's finding that she had acquired clerical skills from her past work as a secretary was in error because her relevant work history should not have included her time spent as a secretary.  Sanders argues that she spent only 7 months as a secretary, and that this is not enough time to qualify as "past relevant work."

The regulations define "past relevant work" as "work that . . . lasted long enough for you to learn to do it." 20 C.F.R. § 416.965; *see also* SSR 82-62 (noting, "[t]he length of time this would take depends in the nature and complexity of the work."). Sanders contends that this means a "one to two year period" because the VE described her secretarial work as "skilled" work, and Sanders' brief assigns this occupation a Specific Vocational Preparation ("SVP") rating of 6. Sanders' argument is based upon Appendix C of the Dictionary of Occupational Titles, which states that the SVP rating of a job determines "the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation" and that jobs with an SVP of 6 may

18

require "over 1 year up to and including 2 years" for the typical worker to learn the skills necessary to achieve average performance. However, Appendix C also acknowledges that workers with vocational or higher education, or previous past relevant experience, will require shorter training times than workers who are wholly new to a particular job or setting.

Taking into account the evidence of Sanders' one year of college education, as well as her previous work as a car rental clerk and her eleven years' work as a reservation agent at Continental Airlines,[2] the ALJ did not err by finding that Sanders' work for a period of seven months as a secretary at a car dealership was "past relevant work."

Further, during the hearing, neither Sanders nor her representative objected to the description of her secretarial work as "past relevant work." The Fifth Circuit has cautioned that, " . . . claimants should not be permitted to scan the record for implied or

---

[2] The DOT describes the job of a reservation clerk as one who "... issues tickets, types itineraries, and compiles reports of transactions: Obtains confirmation of travel and lodging space and rate information. Issues and validates airline tickets from stock or teleticketer and obtains rail and bus tickets from carriers. Prepares passenger travel booklet containing tickets, copy of itinerary, written lodging confirmations, pertinent credit cards, and travel suggestions . . . Prepares and types claim forms for refunds and adjustments and reports of transactions processed." Dictionary of Occupational Titles, 238.362-014. Similarly, the job of secretary is one who "Schedules appointments, gives information to callers, takes dictation, and otherwise relieves officials of clerical work and minor administrative and business detail: Reads and routes incoming mail. Locates and attaches appropriate file to correspondence to be answered by employer. . . Composes and types routine correspondence. Files correspondence and other records. Answers telephone and gives information to callers or routes call to appropriate official and places outgoing calls. Schedules appointments for employer. Greets visitors, ascertains nature of business, and conducts visitors to employer or appropriate person. . . . May arrange travel schedule and reservations. May compile and type statistical reports. May oversee clerical workers. . . . May make copies of correspondence or other printed matter, using copying or duplicating machine. May prepare outgoing mail, using postage-metering machine. May prepare notes, correspondence, and reports, using word processor or computer terminal." Dictionary of Occupational Titles, 201.362-030.

unexplained conflicts between the specific testimony of an expert witness and the voluminous provisions of the DOT, and then present that conflict as reversible error, when the conflict was not deemed sufficient to merit adversarial development in the administrative hearing." *Carey v. Apfel*, 230 F.3d 131, 146–47 (5th Cir. 2000). Accordingly, the ALJ did not err by classifying Sanders' work as a secretary at a car dealership as "past relevant work."

### 2. Is the ALJ's finding that Sanders' skills would transfer to new work supported by substantial evidence?

According to the applicable regulations, persons who are 55 years old or older and who are limited to sedentary or light work must be found to be "disabled" unless they are found to have skills that can transfer to other skilled or semiskilled jobs that they are able perform despite their impairments. The regulations further state that, for this group of claimants, any previously acquired skills are only "transferable" if the new sedentary work is "so similar to [the] previous work that [the claimant] would need to make very little, if any, vocational adjustment in terms of tools, work processes, work settings, or the industry." 20 C.F.R. § 404.1568(d)(4).[3] The ALJ made such a finding in his opinion, stating that Sanders had "acquired work skills from past relevant work that are transferable to other occupations . . . [and] the jobs listed by the vocational expert are so

---

[3] The regulations also generally state that, although transferability usually "depends largely on the similarity of occupationally significant work activities among different jobs," an exact similarity between past and new work is not required for a finding of transferability. 20 C.F.R. § 404.1568(d)(1),(3). Instead, the regulations describe non-transferable skills as those that are so specialized, or applicable only in "an isolated vocational setting (like many jobs in mining, agriculture, or fishing)," that they are "not readily usable in other industries, jobs, and work settings" and are thus are not transferable. *Id.*

similar to the claimant's previous work that the claimant would need to make very little, if any, vocational adjustment." The ALJ's finding also referred to the applicable regulations, including the Medical-Vocational Guidelines and Rule 201.07. Nonetheless, Sanders contends that the ALJ erred because the VE did not actually testify about the degree of vocational adjustment, and that the ALJ's finding about transferability is therefore not supported by substantial evidence. Sanders does not cite any Fifth Circuit cases to support her argument.

Reviewing the record as a whole, the Court finds that substantial evidence supports the ALJ's finding that Sanders acquired skills that would transfer to the listed jobs with "very little, if any, vocational adjustment." The VE listed Sanders' past relevant work as a secretary and as a travel reservations clerk. The various duties of those jobs are discussed above, and they generally include typing, compiling and printing reports, light computer work, communicating with members of the public via telephone, and using a calendar. The VE specifically testified that Sanders could perform the new occupations of information clerk, referral clerk and referral information clerk because these jobs required skills Sanders had already acquired—"She would have skills that would transfer, like an information clerk, to a job that would be occasional use [of her right hand]." Later, the VE again specified that it was her opinion that Sanders had acquired "clerical skills" that would transfer to the proposed list of jobs and that, while Sanders' past work was classified as "skilled," her new possible employment positions were only "semi-skilled" with a lower SVP rating of 3 or 4.

Although the VE did not specify the particular degree of ease with which these skills would "transfer," she affirmed that they would do so. Further, reading the transcript in context, and in light of the jobs listed and Sanders' educational history, the Court finds that the ALJ's decision is supported by substantial evidence. *See also Sergent v. Astrue*, No. 10-cv-01041, 2011 WL 3299051, *8–*12 (S.D. Tex. Aug. 1, 2011) (affirming ALJ's finding that claimant who was of advanced age could perform other work, despite the fact that the ALJ did not specifically ask the VE whether claimant's skills were "transferrable with little or no vocational training or job orientation."). Further, the Court notes again that neither Sanders nor her representative raised this point with the VE in the hearing, despite an ample amount of cross-examination.

Accordingly, the Court finds that the ALJ's finding regarding vocational adjustment was supported by substantial evidence.

### 3. Sanders' evidence to the Appeals Council

Sanders also argues that the ALJ's finding was affirmatively contradicted by new evidence that she submitted after the ALJ hearing to the Appeals Council. Sanders argues that this new evidence submitted to the Appeals Council rebuts the VE's testimony about vocational adjustment, and reversal is therefore required.

The ALJ decision was issued on February 1, 2011. On April 11, 2011, Sanders filed a request for review by the Appeals Council. On June 22, 2011, the Appeals Council notified Sanders that she could file any new evidence within 25 days, and "[w]e will not allow more time to send information except for very good reasons." Tr. 31. On September 19, 2011, the Appeals Council issued its letter denying review of the ALJ's

decision, notifying Sanders that the ALJ's decision was therefore "the final decision of the Commissioner of Social Security in your case [and] [i]f you disagree with our action, you may ask for court review of the [ALJ's] decision by filing a civil action." Tr. 1, 2.

Rather than promptly filing a civil action, Sanders' attorney Carl Weisbrod again contacted the Appeals Council. On September 27, 2012, he sent a letter asking the Appeals Council to "reconsider the previous denial of review" and submitted the report of Mr. Steven Carter, an independently hired vocational rehabilitation consultant. Tr. 4. The record does not contain any response from the Appeals Council.

Sanders now argues that Mr. Carter's report is "new evidence" that warrants remand of the ALJ's decision. The Court, however, disagrees for several reasons. First, even if Mr. Carter's report were a "smoking gun" piece of evidence—which it is not— this Court could not issue an order for remand based upon it. Mr. Carter's report does not appear to have been timely submitted for consideration by the Appeals Council. The procedures for submitting new evidence to the Appeals Council are spelled out in 20 C.F.R. §§ 404.970(b), 416.1585 (a). When evidence is timely submitted to the Appeals Council, that evidence becomes part of the record for this Court's review. *See, e.g., Higginbotham v. Barnhart,* 405 F.3d 332, 337–38 (5th Cir. 2005) (stating that a final decision includes the Appeals Council's denial of review and that evidence submitted to the Appeals Council is to be considered part of the record for the Court's review); *Rodriquez v. Barnhart,* 252 F. Supp. 2d 329, 336 (S.D. Tex. 2003) ("When the Appeals Council denies review, the ALJ's decision becomes the final decision, but the Court should still consider the entire record, including the new evidence considered by the

Appeals Council, when reviewing the ALJ's decision."). In contrast, when this Court is the first to review new evidence, such new evidence can justify a remand only where it is material, and when there is good cause for the petitioner's failure to incorporate such evidence into the record of a prior proceeding. 42 U.S.C. § 405(g); *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995). Sanders' brief makes no mention of her failure to timely submit Mr. Carter's report to the Appeals Council, and she thus wholly fails to assert any "good cause" for her counsel's lateness in submitting the report.

Furthermore, the substance of Mr. Carter's report does warrant remand of this case. Mr. Carter's opinion states that he is a Vocational Rehabilitation Consultant who was hired to review Sanders' case. Mr. Carter concludes that each of the three occupations listed by the VE during the hearing— information clerk, referral clerk, and referral aid—are "either inconsistent with the functional limitations posited by the ALJ or would require extensive vocational adjustment." In support of his opinion, Mr. Carter contends that Sanders cannot work as a referral and information aide because that job, as it is described in the DOT and Worker Traits Data Book, requires frequent reaching and handling activities, and because it is a government service job that would require significant vocational adjustment. Similarly, Mr. Carter contends that Sanders cannot work as a referral clerk because this job requires precise hand and finger movements that are excluded by the ALJ's RFC, and because Sanders "lacks skills and a knowledge base associated with employment in this area." Finally, Mr. Carter contends that Sanders cannot work as an information clerk because, although it requires only occasional reaching and handling, it is nonetheless a job that would require frequent keyboarding

and vocational adjustment. Mr. Carter stated that it was also his opinion that all three of listed jobs would require sitting for more than three hours.

Mr. Carter's opinions, however, do not find support in the portions of the DOT that he cites in his report. He is instead apparently relying on his own, undescribed, experience in the field, or perhaps upon the "Worker Traits Data Book" or other publications. A Westlaw search for social security opinions citing the "Worker Traits Data Book" did not reveal any published or unpublished legal opinions citing this publication, and Mr. Carter's opinion does not describe it as a publication of authority in his field.

After a review of the record, particularly in light of Sanders' own testimony regarding her job experience and education, and the VE's testimony at the hearing, the Court finds that Mr. Carter's opinion does not require remand of this case.

### 4. Did the VE's testimony that Sanders could work as a referral clerk and referral and information aide raise a conflict with the DOT that the ALJ was required to address?

Finally, Sanders contends that two of the jobs the VE identified during her testimony (referral clerk and referral and information aide) exceeded the ALJ's RFC limitations that Sanders should be limited to only occasional use of her right hand. Accordingly, Sanders contends there was a conflict between the VE's testimony and the DOT that the ALJ was required to clarify.

Sanders contends that the DOT descriptions of those jobs require more manual dexterity than allowed by her RFC. Sanders points out that her RFC limited her to only occasional use of her right hand, yet two of these jobs—referral clerk and referral and

information aide—required more than occasional manual dexterity under the DOT definitions.

When it comes to job description in the DOT, the law is clear—the ALJ is entitled to rely upon the unimpeached testimony of the VE. *Carey v. Apfel*, 230 F.3d 131, 146 (5th Cir. 2000) (finding that the ALJ may rely on the vocational expert's testimony if the record reflects an adequate basis for doing so, even if the vocational expert's testimony conflicts with the DOT). Because "categorical DOT job descriptions are neither comprehensive nor exclusively probative of a claimant's ability to perform a particular job," they "should not be given a role that is exclusive of more specific vocational expert testimony with respect to the effect of an individual claimant's limitations on his or her ability to perform a particular job." *Id.* at 144–45. That is, an alleged inconsistency between the DOT descriptions and the VE's testimony is not sufficient to undermine the VE's testimony or invalidate an ALJ's reliance on such testimony.

In Sanders' case, the ALJ's reliance on the VE's testimony was proper, because the VE's testimony was "clear and unchallenged." *Id.* at 147. Both Sanders and the VE attended the hearing and were available for examination. Sanders' representative had the opportunity to develop the record by questioning the VE about whether Sanders' manual dexterity was more limited than allowed by these jobs. In fact, Sanders' representative actually used it to develop a more specific hypothetical question to the VE—one that required the VE to consider Sanders' right hand limitation. Tr. 68–70. Sanders' representative did not, on the other hand, question the VE about her familiarity with the DOT. Further, when the VE proposed three potential jobs for Sanders, Sanders'

representative failed to raise concerns that Sanders' right hand would inhibit her. Tr. 70–71. The VE's testimony therefore remained unchallenged.

Again, the Court points to the Fifth Circuit's admonishment in *Carey*, and finds that Sanders' failure to cross-examine the VE on this point is particularly problematic. Accordingly, the Court finds that the ALJ was entitled to rely on the VE's opinion that Sanders could perform the jobs listed.

## CONCLUSION

A review of the record shows that the ALJ applied the appropriate legal standard in his determination and that his determination was supported by substantial evidence. A review of the briefs and record shows that there is no genuine issue of any material fact in this case, and summary judgment is, therefore, appropriate. Accordingly, this Court recommends that the Commissioner's Motion for Summary Judgment be **GRANTED** and Sanders' Motion for Summary Judgment be **DENIED**.

The parties have 14 days from service of this Memorandum and Recommendation to file written objections. Failure to file timely objections will preclude appellate review of factual findings or legal conclusions, except for plain error. *See* FED. R. CIV. P. 72.

SIGNED at Houston, Texas on this 13th day of November, 2014.

GEORGE C. HANKS, JR.
UNITED STATES MAGISTRATE JUDGE